JAN 1 8 2000

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RealNetworks, Inc.,

Plaintiff,

v.

Streambox, Inc.,

Defendant.

No. C99-2070P

ORDER ON PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION

## INTRODUCTION

Plaintiff RealNetworks, Inc. ("RealNetworks") filed this action on December 21, 1999. RealNetworks claims that Defendant Streambox has violated provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et seq.*, by distributing and marketing products known as the Streambox VCR and the Ripper. RealNetworks also contends that another Streambox product, known as the Ferret, is unlawfully designed to permit consumers to make unauthorized modifications to a software program on which RealNetworks holds the copyright.

On December 21, 1999, RealNetworks applied for a temporary restraining order to bar Streambox from manufacturing, distributing, selling, or marketing the VCR, the Ripper, and the Ferret. On December 23, 1999, Chief Judge Coughenour of this Court entered a Temporary Restraining Order, finding RealNetworks was likely to succeed on the merits of its claims and that it was suffering irreparable harm from Streambox's conduct. The Court also ordered Streambox to show cause as to why the restraints contained in the Temporary Restraining Order should not be continued as a preliminary injunction.

1   After expedited briefing, a show cause hearing was held on January 7, 2000 before the Court.
2   Both parties were permitted to submit overlength briefs in support of their arguments. The Court
3   further requested that both parties submit and highlight portions of the legislative history of the
4   DMCA that they believe to be relevant to interpreting the statute with respect to Plaintiff's claims
5   under the statute.

6   The Court, having considered the papers and pleadings filed herein and having heard oral
7   argument from the parties, concludes that a preliminary injunction should be entered to enjoin the
8   manufacture, distribution, and sale of the Streambox VCR and the Ferret during the pendency of this
9   action. The Court does not conclude that a preliminary injunction should be entered with respect to
10  the Ripper. Pursuant to Fed. R. Civ. P. 52(a), the Court's findings of fact and conclusions of law are
11  stated below.

**FINDINGS OF FACT**

**RealNetworks**

12
13
14      1.      RealNetworks is a public company based in Seattle, Washington that develops and
        markets software products designed to enable owners of audio, video, and other multimedia content
15      to send their content to users of personal computers over the Internet.

16      2.      RealNetworks offers products that enable consumers to access audio and video
17      content over the Internet through a process known as "streaming." When an audio or video clip is
18      "streamed" to a consumer, no trace of the clip is left on the consumer's computer, unless the content
19      owner has permitted the consumer to download the file.

20      3.      Streaming is to be contrasted with "downloading," a process by which a complete
21      copy of an audio or video clip is delivered to and stored on a consumer's computer. Once a
22      consumer has downloaded a file, he or she can access the file at will, and can generally redistribute
23      copies of that file to others.

24      4.      In the digital era, the difference between streaming and downloading is of critical
25      importance. A downloaded copy of a digital audio or video file is essentially indistinguishable
26

ORDER ON PRELIMINARY INJUNCTION – 2

from the original, and such copies can often be created at the touch of a button.  A user who obtains

a digital copy may supplant the market for the original by distributing copies of his or her own.  To

guard against the unauthorized copying and redistribution of their content, many copyright owners

do not make their content available for downloading, and instead distribute the content using

streaming technology in a manner that does not permit downloading.

5.      A large majority of all Internet Web pages that deliver streaming music or video use

the RealNetworks' format.

## RealNetworks' Products

6.      The RealNetworks' products at issue in this action include the "RealProducer," the

"RealServer" and the "RealPlayer."  These products may be used together to form a system for

distributing, retrieving and playing digital audio and video content via the Internet.

7.      Owners of audio or video content may choose to use a RealNetworks product to

encode their digital content into RealNetworks' format.  Once encoded in that format, the media

files are called RealAudio or RealVideo (collectively "RealMedia") files.

8.      After a content owner has encoded its content into the RealMedia format, it may

decide to use a "RealServer" to send that content to consumers.  A RealServer is software program

that resides on a content owner's computer that holds RealMedia files and "serves" them to

consumers through streaming.

9.      The RealServer is not the only available means for distributing RealMedia files.

RealMedia files may also be made available on an ordinary web server instead of a RealServer.  An

end-user can download content from an ordinary web server using nothing more than a freely

available Internet browser such as Netscape's Navigator or Microsoft's Internet Explorer.

10.     To download streaming content distributed by a RealServer, however, a consumer

must employ a "RealPlayer."  The RealPlayer is a software program that resides on an end-user's

1  computer and must be used to access and play a streaming RealMedia file that is sent from a

2  RealServer.

3  ## RealNetworks' Security Measures

4      11.    RealNetworks' products can be used to enable owners of audio and video content to

5  make their content available for consumers to listen to or view, while at the same time securing the

6  content against unauthorized access or copying.

7      12.    The first of these measures, called the "Secret Handshake" by RealNetworks, ensures

8  that files hosted on a RealServer will only be sent to a RealPlayer. The Secret Handshake is an

9  authentication sequence which only RealServers and RealPlayers know. By design, unless this

10  authentication sequence takes place, the RealServer does not stream the content it holds.

11      13.    By ensuring that RealMedia files hosted on a RealServer are streamed only to

12  RealPlayers, RealNetworks can ensure that a second security measure, which RealNetworks calls the

13  "Copy Switch," is given effect. The Copy Switch is a piece of data in all RealMedia files that

14  contains the content owner's preference regarding whether or not the stream may be copied by end-

15  users. RealPlayers are designed to read this Copy Switch and obey the content owner's wishes. If a

16  content owner turns on the Copy Switch in a particular RealMedia file, when that file is streamed, an

17  end-user can use the RealPlayer to save a copy of that RealMedia file to the user's computer. If a

18  content owner does not turn on the Copy Switch in a RealMedia file, the RealPlayer will not allow

19  an end-user to make a copy of that file. The file will simply "evaporate" as the user listens to or

    watches it stream.

20      14.    Through the use of the Secret Handshake and the Copy Switch, owners of audio and

21  video content can prevent the unauthorized copying of their content if they so choose.

22      15.    Content owners who choose to use the security measures described above are likely to

23  be seeking to prevent their works from being copied without their authorization. RealNetworks has

24  proferred declarations from copyright owners that they rely on RealNetworks security measures to

25

26

protect their copyrighted works on the Internet. Many of these copyright owners further state that if users could circumvent the security measures and make unauthorized copies of the content, they likely would not put their content up on the Internet for end-users.

16.     Many copyright owners make content available on their Web site as a means to attract end-users to the Web site; that is, to drive "traffic" to the Web site. The more traffic a Web site generates, the more it can charge for advertisements placed on the Web site. Without RealNetworks' security measures, a copyright owner could lose the traffic its content generates. An end-user could obtain a copy of the content after only one visit and listen to or view it repeatedly without ever returning to the Web site. That end-user could also redistribute the content to others who would then have no occasion to visit the site in the first instance.

17.     Copyright owners also use Real Networks' technology so that end-users can listen to, but not record, music that is on sale, either at a Web site or in retail stores. Other copyright owners enable users to listen to content on a "pay-per-play" basis that requires a payment for each time the end-user wants to hear the content.  Without the security measures afforded by RealNetworks, these methods of distribution could not succeed. End-users could make and redistribute digital copies of any content available on the Internet, undermining the market for the copyrighted original.

18.     RealNetworks' success as a company is due in significant part to the fact that it has offered copyright owners a successful means of protecting against unauthorized duplication and distribution of their digital works.

### The RealPlayer Search Functionality

19.     In addition to its content playing and content protection capabilities, the RealPlayer enables end-users to search the Internet for audio and video content. Currently, a company known as Snap! LLC supplies the search services available to end-users through the RealPlayer under a contract with RealNetworks.

ORDER ON PRELIMINARY INJUNCTION – 5

20.     Under RealNetworks' contract with Snap, the search bar on the bottom of the RealPlayer's graphical user interface (the screen end-users view and interact with) is emblazoned with Snap's logo. An end-user can input a search request by inserting "key words" into the search bar. The RealPlayer then uses Snap's search services to locate specific content corresponding to the search request from among the millions of media files available on the Internet. The RealPlayer then routes the end-user to a Web site maintained and co-branded by RealNetworks and Snap, where the names and locations of the files responsive to the search request are displayed.

21.     Through this process, Snap garners visibility and visitors, enhancing Snap's ability to sell advertising and products. Snap compensates RealNetworks for the promotional value it receives based on the number of searches performed by users who are directed to the Snap search engine. RealNetworks maintains that it has earned several million dollars from its contract with Snap.

### Streambox

22.     Defendant Streambox, Inc. is a Washington corporation which provides software products for processing and recording audio and video content, including but not limited to content which is streamed over the Internet. Streambox also maintains a searchable database of Internet web addresses of various audio and video offerings on the Internet.  The Streambox products at issue in this case are known as the Streambox VCR, the Ripper, and the Ferret.

### Streambox VCR

23.     The Streambox VCR enables end-users to access and download copies of RealMedia files that are streamed over the Internet. While the Streambox VCR also allows users to copy RealMedia files that are made freely available for downloading from ordinary web servers, the only function relevant to this case is the portions of the VCR that allow it to access and copy RealMedia files located on RealServers.

24.     In order to gain access to RealMedia content located on a RealServer, the VCR mimics a RealPlayer and circumvents the authentication procedure, or Secret Handshake, that a

RealServer requires before it will stream content. In other words, the Streambox VCR is able to convince the RealServer into thinking that the VCR is, in fact, a RealPlayer.

25.     Having convinced a RealServer to begin streaming content, the Streambox VCR, like the RealPlayer, acts as a receiver. However, unlike the RealPlayer, the VCR ignores the Copy Switch that tells a RealPlayer whether an end-user is allowed to make a copy of (i.e., download) the RealMedia file as it is being streamed. The VCR thus allows the end-user to download RealMedia files even if the content owner has used the Copy Switch to prohibit end-users from downloading the files.

26.     The only reason for the Streambox VCR to circumvent the Secret Handshake and interact with a RealServer is to allow an end-user to access and make copies of content that a copyright holder has placed on a RealServer in order to secure it against unauthorized copying. In this way, the Streambox VCR acts like a "black box" which descrambles cable or satellite broadcasts so that viewers can watch pay programming for free. Like the cable and satellite companies that scramble their video signals to control access to their programs, RealNetworks has employed technological measures to ensure that only users of the RealPlayer can access RealMedia content placed on a RealServer. RealNetworks has gone one step further than the cable and satellite companies, not only controlling access, but also allowing copyright owners to specify whether or not their works can be copied by end-users, even if access is permitted. The Streambox VCR circumvents both the access control and copy protection measures.

27.     The Streambox VCR can be distinguished from a third-party product sold by RealNetworks called GetRight. GetRight enables end-users to download RealAudio files that have been placed on a web server, but not RealAudio files placed on a RealServer.

28.     A copyright owner that places a RealMedia file onto a web server instead of a RealServer does not make use of protections offered by the RealNetworks security system. Thus, when GetRight is used to obtain such a file, it need not and does not circumvent RealNetworks'

access control and copyright protection measures.  GetRight cannot access materials available from a RealServer because it cannot perform the requisite Secret Handshake.  Unlike GetRight, the Streambox VCR circumvents the Secret Handshake and enables users to make digital copies of content that the copyright owner has indicated that it should not be copied.

29.    Once an unauthorized, digital copy of a RealMedia file is created it can be redistributed to others at the touch of a button.

30.    Streambox's marketing of the VCR notes that end-users can "[d]ownload RealAudio and RealMedia files as easily as you would any other file, then reap the benefits of clean, unclogged streams straight from your hard drive" and that the product can be used by "savvy surfers who enjoy taking control of their favorite Internet music/video clips."

31.    The Streambox VCR poses a threat to RealNetworks' relationships with existing and potential customers who wish to secure their content for transmission over the Internet and must decide whether to purchase and use RealNetworks' technology.  If the Streambox VCR remains available, these customers may opt not to utilize RealNetworks' technology, believing that it would not protect their content against unauthorized copying.

**Streambox Ripper**

32.    Streambox also manufactures and distributes a product called the Streambox Ripper. The Ripper is a file conversion application that allows conversion (adaptation) of files from RealMedia format to other formats such as .WAV, .RMA, and MP3.  The Ripper also permits conversion of files between each of these formats, i.e., .WAV to .WMA and .WAV to MP3.

33.    The Ripper operates on files which are already resident on the hard disk of the user's computer.  The Ripper permits users to convert files that they have already created or obtained (presumably through legitimate means) from one format to another.

34.    Streambox has proferred evidence that one potential use of the Ripper would be to permit copyright owners to translate their content directly from the RealMedia format into other

ORDER ON PRELIMINARY INJUNCTION – 8

formats that they may wish to utilize for their own work. Streambox has provided examples of various content owner who need a way to convert their own RealMedia files into different formats, such as .WAV for editing, or .WMA to accommodate those users who wish to access the content with a Windows Media Player instead of a RealPlayer. In addition, content which is freely available, such as public domain material and material which users are invited and even encouraged to access and copy, may be converted by the Ripper into a different file format for listening at a location other than the user's computer.

### Streambox Ferret

35.     Streambox manufactures, markets, and distributes a third product called the Streambox Ferret. The Ferret may be installed as a "plug-in" application to the RealPlayer.

36.     When a consumer installs the Ferret as a plug-in to the RealPlayer, the RealPlayer's graphical user interface is configured with an added button, which allows the user to switch between the Snap search engine and the Streambox search engine. The use of the Ferret may also result in replacement of the "Snap.Com" logo that appears on the RealPlayer's graphical user interface with a "Streambox" logo.

37.     When consumers install the Ferret as a plug-in to the RealPlayer, the visual appearance and operation of the RealPlayer is altered.

### CONCLUSIONS OF LAW

1.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338.

2.     The Court finds that RealNetworks has standing to pursue DMCA claims under 17 U.S.C. § 1203, which affords standing to "any person" allegedly injured by a violation of sections 1201 and 1202 of the DMCA.

1

**Preliminary Injunction Standard**

2    3.    To obtain a preliminary injunction, a party must show either (1) a combination of

3   probable success on the merits and the possibility of irreparable harm, or (2) that serious questions

4   are raised and the balance of hardships tips in its favor. *Apple Computer v. Formula Int'l, Inc.*, 725

5   F.2d 521, 523 (9th Cir. 1984).   These are not separate tests, but rather "opposite ends of a single

6   'continuum in which the required showing of harm varies inversely with the required showing of

7   meritoriousness.'" *Rodeo Collection v. West* Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987); *Cadence

8   Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 826 (9th Cir. 1997), *cert denied*, 118 S.Ct. 1795

9   (1998) (quotation omitted).

10    4.    RealNetworks argues that a plaintiff who demonstrates a reasonable likelihood of

11   success on claims under section 1201 of the DMCA is entitled to a presumption of irreparable

12   harm.  In support of this argument, RealNetworks cites cases in which such a presumption was

13   afforded to plaintiffs who brought copyright infringement claims. *See Cadence Design Sys., Inc. v.

14   Avant! Corp.*, 125 F.3d 824, 827 (9th Cir. 1997), *cert. denied*, 118 S. Ct. 1795, and *Triad Sys. Corp.

15   v. Southeastern Express*, 64 F.3d 1330, 1335 (9th Cir. 1995).

16    5.    RealNetworks' claims against the Streambox VCR and the Ripper, by contrast, arise

17   under section 1201 of the DMCA, and thus do not constitute copyright "infringement" claims. *See

18   1 Nimmer on Copyright* (1999 Supp.), § 12.A17[B] (noting that section 1201 of the DMCA

19   occupies "a niche distinct from copyright infringement" and that section 1201 is removed from the

20   Act's definition of copyright infringement.)  Because the DMCA is a recently-enacted statute, there

21
     appears to be no authority holding that a plaintiff seeking a preliminary injunction who shows a
22
     reasonable likelihood of success on a claim arising under section 1201 of the DMCA is entitled to a
23
     presumption of irreparable harm.
24

25

26

ORDER ON PRELIMINARY INJUNCTION – 10

**RealNetworks Has Demonstrated a Reasonable Likelihood of Success on its DMCA Claims With Respect to the Streambox VCR**

6.   The DMCA prohibits the manufacture, import, offer to the public, or trafficking in any technology, product, service, device, component, or part thereof that: (1) is primarily designed or produced for the purpose of circumventing a technological measure that effectively "controls access to" a copyrighted work or "protects a right of a copyright owner;" (2) has only limited commercially significant purpose or use other than to circumvent such technological protection measures; or (3) is marketed for use in circumventing such technological protection measures. 17 U.S.C. §§ 1201(a)(2), 1201(b).

Parts of the VCR Are Likely to Violate Sections 1201(a)(2) and 1201(b)

7.   Under the DMCA, the Secret Handshake that must take place between a RealServer and a RealPlayer before the RealServer will begin streaming content to an end-user appears to constitute a "technological measure" that "effectively controls access" to copyrighted works. *See* 17 U.S.C. § 1201(a)(3)(B) (measure "effectively controls access" if it "requires the application of information or a process or a treatment, with the authority of the copyright holder, to gain access to the work"). To gain access to a work protected by the Secret Handshake, a user must employ a RealPlayer, which will supply the requisite information to the RealServer in a proprietary authentication sequence.

8.   In conjunction with the Secret Handshake, the Copy Switch is a "technological measure" that effectively protects the right of a copyright owner to control the unauthorized copying of its work. *See* 17 U.S.C. § 1201(b)(2)(B) (measure "effectively protects" right of copyright holder if it "prevents, restricts or otherwise limits the exercise of a right of a copyright owner"); 17 U.S.C. §106(a) (granting copyright holder exclusive right to make copies of its work). To access a RealMedia file distributed by a RealServer, a user must use a RealPlayer. The RealPlayer reads the Copy Switch in the file. If the Copy Switch in the file is turned off, the RealPlayer will not permit

1  the user to record a copy as the file is streamed. Thus, the Copy Switch may restrict others from
2  exercising a copyright holder's exclusive right to copy its work.

3      9.      Under the DMCA, a product or part thereof "circumvents" protections afforded a
4  technological measure by "avoiding, bypassing, removing, deactivating or otherwise impairing" the
5  operation of that technological measure. 17 U.S.C. §§ 1201(b)(2)(A), 1201(a)(2)(A). Under that
6  definition, at least a part of the Streambox VCR circumvents the technological measures
7  RealNetworks affords to copyright owners. Where a RealMedia file is stored on a RealServer, the
8  VCR "bypasses" the Secret Handshake to gain access to the file. The VCR then circumvents the
9  Copy Switch, enabling a user to make a copy of a file that the copyright owner has sought to protect.

10      10.     Given the circumvention capabilities of the Streambox VCR, Streambox violates the
11  DMCA if the product or a part thereof: (i) is primarily designed to serve this function; (ii) has only
12  limited commercially significant purposes beyond the circumvention; or (iii) is marketed as a means
13  of circumvention. 17 U.S.C. §§ 1201(a)(2)(A-C), 1201(b)(b)(A-C). These three tests are
14  disjunctive. *Id.* A product that meets only one of the three independent bases for liability is still
15  prohibited. Here, the VCR meets at least the first two.

16      11.     The Streambox VCR meets the first test for liability under the DMCA because at least
17  a part of the Streambox VCR is primarily, if not exclusively, designed to circumvent the access
18  control and copy protection measures that RealNetworks affords to copyright owners. 17 U.S.C. §§
19  1201(a)(2)(A), 1201(b)(c)(A).

20      12.     The second basis for liability is met because portion of the VCR that circumvents the
21  Secret Handshake so as to avoid the Copy Switch has no significant commercial purpose other than
22  to enable users to access and record protected content. 17 U.S.C. § 1201(a)(2)(B), 1201(b)(d)(B).
   There does not appear to be any other commercial value that this capability affords.

23      13.     Streambox's primary defense to Plaintiff's DMCA claims is that the VCR has
24  legitimate uses. In particular, Streambox claims that the VCR allows consumers to make "fair use"
25
26

1  copies of RealMedia files, notwithstanding the access control and copy protection measures that a

2  copyright owner may have placed on that file.

3      14.     The portions of the VCR that circumvent the secret handshake and copy switch

4  permit consumers to obtain and redistribute perfect digital copies of audio and video files that

5  copyright owners have made clear they do not want copied.  For this reason, Streambox's VCR is not

6  entitled to the same "fair use" protections the Supreme Court afforded to video cassette recorders

7  used for "time-shifting" in *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).

8      15.     The *Sony* decision turned in large part on a finding that substantial numbers of

9  copyright holders who broadcast their works either had authorized or would not object to having

10  their works time-shifted by private viewers. *See Sony*, 464 U.S. at 443, 446.  Here, by contrast,

11  copyright owners have specifically chosen to prevent the copying enabled by the Streambox VCR by

12  putting their content on RealServers and leaving the Copy Switch off.

13      16.     Moreover, the *Sony* decision did not involve interpretation of the DMCA.  Under the

14  DMCA, product developers do not have the right to distribute products that circumvent

15  technological measures that prevent consumers from gaining unauthorized access to or making

16  unauthorized copies of works protected by the Copyright Act.  Instead, Congress specifically

17  prohibited the distribution of the tools by which such circumvention could be accomplished.  The

18  portion of the Streambox VCR that circumvents the technological measures that prevent

19  unauthorized access to and duplication of audio and video content therefore runs afoul of the

20  DMCA.

21      17.     This point is underscored by the leading treatise on copyright, which observes that the

22  enactment of the DMCA means that "those who manufacture equipment and products generally can

23  no longer gauge their conduct as permitted or forbidden by reference to the *Sony* doctrine.  For a

24  given piece of machinery might qualify as a stable item of commerce, with a substantial

25  noninfringing use, and hence be immune from attack under *Sony*'s construction of the Copyright Act

26

ORDER ON PRELIMINARY INJUNCTION – 13

1   -- but nonetheless still be subject to suppression under Section 1201." 1 *Nimmer on Copyright* (1999

2   Supp.), § 12A.18[B].  As such, "[e]quipment manufacturers in the twenty-first century will need to

3   vet their products for compliance with Section 1201 in order to avoid a circumvention claim, rather

4   than under *Sony* to negate a copyright claim."  *Id.*

5       18.     Streambox also argues that the VCR does not violate the DMCA because the Copy

6   Switch that it avoids does not "effectively protect" against the unauthorized copying of copyrighted

7   works as required by § 1201(a)(3)(B).  Streambox claims this "effective" protection is lacking

8   because an enterprising end-user could potentially use other means to record streaming audio content

9   as it is played by the end-user's computer speakers.  This argument fails because the Copy Switch, in

10  the ordinary course of its operation when it is on, restricts and limits the ability of people to make

11  perfect digital copies of a copyrighted work.  The Copy Switch therefore constitutes a technological

12  measure that effectively protects a copyright owner's rights under section. 1201(a)(3)(B).

13      19.     In addition, the argument ignores the fact that before the Copy Switch is even

14  implicated, the Streambox VCR has already circumvented the Secret Handshake to gain access to a

15  unauthorized RealMedia file.  That alone is sufficient for liability under the DMCA. *See* 17 U.S.C.

16  §1201(i)(e).

17      20.     Streambox's last defense to liability for the VCR rests on Section 1201(c)(3) of the

18  DMCA which it cites for the proposition that the VCR is not required to respond to the Copy Switch.

19  Again, this argument fails to address the VCR's circumvention of the Secret Handshake, which is

    enough, by itself, to create liability under Section 1201(a)(2).

20
        21.     Moreover, Section 1201(c)(3) states that "[n]othing in this section shall require . . . a
21
    response to any particular technological measure, so long as . . . the product . . . does not otherwise
22
    fall within the prohibitions of subsections (a)(2) or (b)(1)."  17 U.S.C. §1201(c)(3).  As the
23
    remainder of the statute and the leading copyright commentator make clear, Section 1201(c)(3) does
24
    not provide immunity for products that circumvent technological measures in violation of Sections
25

26

ORDER ON PRELIMINARY INJUNCTION – 14

1201 (a)(2) or (b)(1). *See* 17 U.S.C. §1201(c)(3) (a product need not respond to a particular measure "so long as such...product...does not otherwise fall within the prohibitions of subsections (a)(2) or (b)(1)." (emphasis added); 1 *Nimmer on Copyright* (1999 Supp.), §12A.05[C]. If the statute meant what Streambox suggests, any manufacturer of circumvention tools could avoid DMCA liability simply by claiming it chose not to respond to the particular protection that its tool circumvents.

22.     As set forth above, the Streambox VCR falls within the prohibitions of sections 1201(a)(2) and 1201(b)(1). Accordingly, Section 1201(c)(3) affords Streambox no defense.

**RealNetworks is Likely to Suffer Irreparable Harm With Respect to the VCR**

23.     RealNetworks argues that because it has demonstrated a reasonable likelihood of success on its DMCA claims concerning the VCR, it is entitled to a presumption of irreparable harm. As noted above, however, this point is not settled.

24.     Assuming that a plaintiff who demonstrates a reasonable likelihood of success with respect to claims arising under section 1201 of the DMCA is entitled to a presumption of irreparable harm, RealNetworks would be entitled to such a presumption.

25.     In the event that such a presumption is not applicable, RealNetworks has demonstrated that it would likely suffer irreparable harm if the Streambox VCR is distributed. The VCR circumvents RealNetworks' security measures, and will necessarily undermine the confidence that RealNetworks' existing and potential customers have in those measures. It would not be possible to determine how many of RealNetworks' existing or potential customers declined to use the company's products because of the perceived security problems created by the VCR's ability to circumvent RealNetworks' security measures.

26.     An injunction against the VCR also would serve the public interest because the VCR's ability to circumvent RealNetworks' security measures would likely reduce the willingness of copyright owners to make their audio and video works accessible to the public over the Internet.

**RealNetworks Has Not Demonstrated that It Is Reasonably Likely to Succeed on its DMCA Claim With Respect to the Ripper.**

27.     RealNetworks also alleges that Streambox's marketing and distribution of the Ripper violates section 1201(b) (but not section 1201(a)(2)) of the DMCA.

28.     RealNetworks maintains that the primary purpose and only commercially significant use for the Ripper would be to enable consumers to prepare unauthorized "derivatives" of copyrighted audio or video content in the RealMedia format in violation of 17 U.S.C. § 106(2).

29.     The Ripper has legitimate purposes and commercially significant uses.  For example, the Ripper may be used by content owners, including copyright holders, to convert their content from the RealMedia format to other formats.  Streambox has submitted evidence that at least some content owners would use the Ripper for this legitimate purpose.  The Ripper may also be used by consumers to convert audio and video files that they acquired with the content owner's permission from RealMedia to other formats.  RealNetworks has not demonstrated that it is likely to succeed on its claims that the Ripper violates sections 1201(b)(1)(A) or (B) of the DMCA.

30.     RealNetworks' DMCA claims with respect to the Ripper rely largely on its argument that the proprietary RealMedia format constitutes a technological measure that effectively protects a right of a copyright owner because it prevents end-users from making derivative works based on audio or video content that a consumer obtains in RealMedia format.  RealNetworks did not offer this argument in any detail in its opening memorandum.

31.     There is little evidence that content owners use the RealMedia format as a "technological measure" to prevent end-users from making derivative works.  In any case, RealNetworks has not introduced evidence that a substantial number of content owners would object to having end-users convert RealMedia files that they legitimately obtain into other formats.

32.     Similarly, RealNetworks has not submitted substantial evidence that the Ripper's alleged violations of section 1201(b) will cause RealNetworks injury.  None of the numerous declarations submitted by RealNetworks' customers or recording industry employees express

concern that the Ripper will permit RealMedia files to be converted to other formats. Instead, persons who submitted these declarations indicate that they are concerned that unnamed Streambox products will permit consumers to acquire unauthorized copies of copyrighted works that are made available only in the streaming format. These concerns appear to relate to the functions of the Streambox VCR, not to the functions of the Ripper. The Ripper functions as a "converter," not as a copier. As such, these declarations do not suggest that the Ripper's alleged violations of section 1201(b) will result in any injury to RealNetworks in the form of lost customers or business.

33.     RN further alleges that Streambox's marketing of the Ripper violates section 1201(b)(1)(C) of the DMCA. The brief quotes from Streambox's promotional materials that RealNetworks references do not appear to urge consumers to buy the Ripper in order to create derivative works in violation of the Copyright Act. The evidence submitted by RealNetworks is not sufficient to show a reasonable likelihood of success on its claims under section 1201(b)(1)(C).

34.     In light of Streambox's demonstration that the Ripper has legitimate and commercially significant uses, RealNetworks has not shown that it is likely to succeed on its DMCA claims with respect to the product.

35.     Even if RealNetworks had raised a "serious question" about the Ripper's alleged violation of the DMCA, RealNetworks has not demonstrated that the balance of hardships tips sharply in its favor. As noted above, RealNetworks has not submitted evidence that the sale of the Ripper would cause it to lose customers or goodwill.  By contrast, enjoining the Ripper would deprive Streambox of the ability to market a potentially valuable product with legitimate uses.

**RealNetworks Has Demonstrated that It Is Entitled to a Preliminary Injunction with Respect to the Ferret**

36.     Finally, RealNetworks claims that Streambox commits contributory and/or vicarious copyright infringement by distributing the Ferret product to the public. In order to prevail on such claims, RealNetworks must demonstrate that consumers who use the Ferret as a plug-in to the

RealPlayer infringe RealNetworks' rights as a copyright owner.  RealNetworks alleges that consumers who install the Ferret as a plug-in application to a RealPlayer create an unauthorized derivative of the RealPlayer, thus violating RealNetwork's rights under 17 U.S.C. § 106(2).

37.     RealNetworks holds a valid copyright registration for version 7 of the RealPlayer, which constitutes prima facie evidence that RealNetworks is the owner of the copyright to the program.  *See Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 523 (9th Cir. 1984).

38.     Streambox does not dispute that consumers who use the Ferret as a plug-in to a RealPlayer create a change the RealPlayer user interface by adding a clickable button that permits the user to access the Streambox search engine, rather than the Snap search engine.

39.     Streambox claims that changes that the Ferret makes to the RealPlayer do not constitute the creation of a derivative work.  To support this argument, Streambox cites generally the Ninth Circuit's decision in *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965 (9th Cir. 1992).  As RealNetworks notes, however, the court in *Galoob* held that the manufacturer of a product that altered the audiovisual displays of a Nintendo game did not commit contributory copyright infringement because the "[t]he altered displays do not incorporate a portion of a copyrighted work in some concrete or permanent form."  *Id.* at 968.  Here, by contrast, the alterations to the RealPlayer  assume a more concrete form that the altered displays at issue in *Galoob*.

40.     However, the Court is not persuaded that RealNetworks has demonstrated that it is likely to succeed on its contributory/vicarious copyright infringement claims with respect to the Ferret.  The facts and issues presented in the principal case that RealNetworks relies upon, *Micro Star v. Formgen, Inc.*, 154 F.3d 1107 (9th Cir. 1998), do not appear to be completely analogous to the

situation here.  In addition, RealNetworks' argument that consumers who install the Ferret breach a

license agreement that they must agree to in order to obtain the RealPlayer was first raised in

RealNetworks' reply brief.

41.     Nonetheless, the Court concludes that RealNetworks has raised serious questions

going to the merits of its claim.  It is undisputed that consumers who install the Ferret as a plug-in

application to the RealPlayer cause the graphical interface of the RealPlayer to be modified, arguably

creating a derivative work under 17 U.S.C. § 106(2) without the copyright owner's authorization.  In

addition, RealNetworks has proferred evidence that end users who install the Ferret are violating a

license agreement with RealNetworks.

42.     A plaintiff seeking a preliminary injunction who raises serious questions going to the

merits of its claim is entitled to an injunction if the balance of hardships tips sharply in its favor.  *See*

*Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1109 (9th Cir. 1998).

43.     The balance of hardships here clearly favors RealNetworks.  The Ferret's ability to

permit consumers to modify the RealPlayer jeopardizes RealNetworks' exclusive relationship with

Snap.  In addition, each time a consumer opts to use the Streambox search engine that is present on a

modified RealPlayer rather than the Snap search engine that is present on an unmodified RealPlayer

costs RealNetworks royalty payments from Snap, and it would be difficult if not impossible to

calculate the lost revenue to RealNetworks.

44.     By contrast, the hardship that Streambox would experience if an injunction issued

against the product would not be nearly as severe.  The Ferret plug-in simply provides consumers

with a way to access the Streambox search engine through the RealPlayer.  The Streambox search

engine is already accessible to consumers in other places.  If the Ferret is not available for

distribution as a plug-in to the RealPlayer, consumers will still have the ability to conveniently access and use the Streambox search engine.

## CONCLUSION

Consistent with the findings of fact and conclusions of law above, the Court hereby ORDERS that:

During the pendency of this action, Defendant Streambox, Inc. and its officers, agents, servants, employees and attorneys, and those persons in active concert and participation with Streambox, Inc. who receive actual notice of this Preliminary Injunction, are restrained and enjoined from manufacturing, importing, licensing, offering to the public, or offering for sale:

a) versions of the Streambox VCR or similar products that circumvent or attempt to circumvent RealNetworks' technological security measures, and from participating or assisting in any such activity;

b) versions of the Streambox Ferret or similar products that modify RealNetworks' RealPlayer program, including its interface, its source code, or its object code, and from participating or assisting in any such activity.

Plaintiff's motion for a preliminary injunction with respect to the Streambox Ripper is DENIED.

This Order shall be effective immediately, on the condition that RealNetworks continues to maintain security with the Clerk in the amount of $1,000,000 for the payment of such costs and damages as may be incurred by Streambox if it is found that Streambox was wrongfully enjoined by this Order.

The TRO entered by Judge Coughenour on December 23, 1999, and extended by the Court until 5:00 p.m. on January 18, 2000, is hereby VACATED by this Order.

The clerk is directed to provide copies of this order to all counsel of record.

Dated: January 18, 2000.

Marsha J. Pechman
United States District Judge

ORDER ON PRELIMINARY INJUNCTION – 21